Good morning. We have four argued cases this morning. The first of these is number 14-1464, High Point Design LLC v. Buyer''s Direct, Inc. Mr. Aulis. Is that how you pronounce it? Yes. May it please the court, my name is Andy Aulis on behalf of Buyer''s Direct, Inc. I''d like to start with the patent issues, which are before this court at the summary judgment stage. The first issue I''d like to discuss is claim construction, which affects both the validity and infringement analysis. Could I ask you a question? A significant part of your argument, at least on the infringement issue, appears to be that you should consider the flipper with a foot inside it. I didn''t see that there were any cases that the parties cited that addressed that question, but when I look at the MPEP, it seems to me that if you want to claim a design, for example, with a foot in it or a body in it, that the MPEP contemplates that you''re going to draw that in the design patent to show the particular environment in which the thing is displayed. And I''d like you to address that as to whether you can claim that the foot changes the shape of the thing without drawing the foot as part of the design in the patent. Yes, Your Honor, thank you. We also are not aware of any case law that directly addresses that point. In the MPEP, it is permissible but not required to illustrate, for example, in phantom lines, an environment that may show a foot or even in solid lines if that''s desired. But it''s not required, we respectfully request. And in contest of foods... Well, it''s not required in the sense that you don''t have to claim that, but if you don''t show it, how can you claim it? Well, Your Honor, we believe that the article itself can be compared to the patented design at any point in its lifetime. And in both contest of foods and in international seaway, this court had stated that in an infringement analysis, it''s appropriate to compare the accused products to the patented design at any point in its life. Yeah, except those were cases in which the design didn''t change. It was just a question of the vantage point foreseeing the design. That is correct, Your Honor. And again, there are no cases that are factually identical to the cases here. But we believe that the analysis and the statements concerning when it is appropriate to compare an accused product to a patented design is equally applicable here. And even if the design changes a little bit, that''s still appropriate. It''s still an appropriate comparison to make. Again, it''s consistent with Contessa, and there''s no requirement that we''re aware of to show the foot on the body. There are many design patents. I think we showed an illustration of a T-shirt where it''s illustrated as if it was on a mannequin or a body, but there''s no body shown. So it''s common practice, to our knowledge, to approach design patents this way. But if it''s not shown in the patent on the human being, how is a competitor supposed to know what the thing looks like when it is on the human body? It''s not necessary to determine what it looks like when it''s on the human body. It''s just simply a question of if at any point in time the article that''s accused looks substantially identical to the patented design, there may be infringement. For example, although it''s not on the record, we have learned during the course of this appeal that High Point advertises at trade shows using mannequins. They advertise in other instances with showing the foot in the accused''s fuzzy bobber slipper. So those instances are just as appropriate to make the comparison with the foot in it or without when we submit your decision. So I guess your point is if the fuzzy bobber, just a photo of it by itself, looks like some kind of very sad shapeless bag, but then once it''s being worn by a customer, all of a sudden it sort of poofs up, pops up, and now looks like it has some structure that looks more and more like your patented drawings, then that''s something we should consider. Yes, Your Honor. And again, in this case, not only that, but we have seen evidence and this goes to part of our concern that the record''s not fully developed with respect to infringement. We have seen, in fact, advertising where High Point is using exactly those views in order to sell these products. And naturally, in the case of a slipper, that is the purpose of the article, is to be worn on the foot. I mean, that''s the purpose of the design, the look that would be of most interest. But why shouldn''t you have to show, if the thing on and off the foot looks different, why shouldn''t you be required to show that in the design patents so people know what is being claimed? Your Honor, I think of it more as an option. There are, for example, it is a possibility to, you can claim, I think both in utility patents or design patents, a snapshot that a particular product looks, has a particular look or structure at a given point in time. In design patents, for example, in graphical user interfaces, you are permitted to, but not required, to do a sequence if you wish. But if not, the test is quite simple and it is simply whether at any point in time the accused product looks substantially similar to the patented design. Well, in terms of the infringement here, even if one were to treat it on the foot and compare it to the patented design, there still seem to be some potentially significant differences. Do you want to address that question? Yes, Your Honor, absolutely. And we recognize that, in fact, the design patent case law recognizes that virtually no article is exactly identical to a particular patented design. The question in the case law, in the analysis, is are those differences substantial or are they insubstantial? And this is a very fact-intensive question. In Egyptian Goddess, this court pointed out that where there is prior art that may be relatively close and to be considered, the features which distinguish the prior art from the patented design may be particularly relevant to the infringement analysis. And here, for example, the features with respect to the protruding fluff and the fact that the toe is not raised, there is no protruding side welt, all those features also distinguish the accused product, just as for the prior art. And so all features are not necessarily equal. Next, the Gorham case, the Supreme Court has advised that the basic test is to give such attention as an ordinary purchaser usually gives. The record is clear in this instance, Your Honor, that the ordinary purchaser here is probably an impulse purchase. It's a relatively inexpensive article. There's not as much deference given in that instance. These are all fact-intensive questions that are part of the analysis. Turning to the specific features... Wouldn't you agree, though, that if your patent is somehow able to survive a validity inquiry, it's because we have to look very carefully and find all the differences between the patent design and the prior art design and to give weight to that and say, all right, this is just different enough from that very close prior art slipper. That's why we're going to say it passes validity. But that same kind of analysis also applies in the infringement inquiry. So for the same basic reason why your patent survives validity, it might also be the same thinking for why the defendant here or the D.J. plaintiff here is able to prevail on infringement. Your Honor, the question is certainly a fair one. But if we look closely at the analysis and the specific features that have been identified, we can see that not all the features are being treated the same way. I think the Patent Office, which is the only neutral party that's done an evaluation to date, now we have the benefit of its views weighing in in the reexamination and finding the patent valid over the prior art. Well, they don't consider the infringement question. That's correct. But the way it analyzed the prior art and compared it to the patent is instructive. So for example, it singled out only two of the four or five features that were discussed in the record in these briefings. And I'll give you an illustration. The opening of the foot is a different shape in the prior art products than in the patented design. And we've suggested that that was a basis for distinction. The Patent Office apparently disagreed. They didn't point to that feature. So not all features are being treated equally here. It seems to me kind of odd for us to be saying, well, they didn't consider this feature in determining validity and therefore we're going to say it has nothing to do with infringement. Well, I would respectfully disagree, Your Honor, in the sense that, again, in Egyptian goddess, the features that are focused on in distinguishing over making the patent valid are suggested that those are appropriate features to focus on. And conversely, we say the ones that we're not focused on inform the infringement analysis equally. Well, what's wrong with what the district court said when it said that the overall impression of the fuzzy baba is this kind of soft, malleable, shapeless product with an indistinguishable sole. But then when you look at the drawings in the design patent, there's a sense of structure to that patented product. You see these upward curves in the outer shell of the slipper that really suggests that your patent design, it has some innate structure to it as compared to the fuzzy baba, which is just, you know, starting to get close to being almost like a sock. Your Honor, well, first of all, the district court, we believe, imported a number of limitations into the claim construction, including that the patented design was tough and sturdy, that it had a thick sole that was sturdy, it was made of tough material, and also including all of these, it relied on all of these distinctions, including as well the structure feature and imposed on the design the idea that it couldn't change shape. That's reading a lot into... Let's get to my question, which is, what if I just read the district court as saying, in a world of relativism, the design patent drawings look like a slipper with much more innate structure to it, that it has a pre-programmed shape to it, whereas when we look at something like the fuzzy baba, it's so soft and malleable that it has, relatively speaking, a much less sense of structure to it. Because, Your Honor, again, we believe that the proper interpretation is very simple, a question of infringement at the end of the day, and simply is, does the accused product look like the patented design at any point in its lifetime? Yeah, but the problem is, if you look, for example, at page 20 of the red brief, and you compare the two, there do seem to be quite a few differences that are not necessarily all identified by the district court, but it's de novo review on summary judgment, so we're not bound by what the district court said, nor do we have to remand if he got it wrong, as long as the result is right. Well, a couple points. If it's the one I believe, is that a four-way comparison on page 20? Well, you don't have the brief. First of all, Your Honor, this is one of two different views. There's also a view of the slipper with the foot in it, and there's a separate view on page 11 of our reply brief, for example, of another fuzzy bottle slipper that shows the opening essentially identical, even by itself, to that particular view. And part of the issue we respectfully submit, Your Honor, is that, again, because these things, the view may change depending even on the particular slipper or how it's even been set on the table. The complete analysis for infringement requires consideration of all of the views of both slippers that are presented here. Well, right. But if one of the views is quite different, that's significant, even though another view might be similar, right? But, again, Your Honor, this is where we come back to the teachings in Contessa and International Seaway, which is that the test that this Court has repeatedly provided is that the accused product must be considered throughout their entire lifetime. And that's why we submit that even if the court were to find at one point, in this case, that it's stuffed and sold on Amazon in that particular view, it did not look like the patented design. That does not foreclose a comparison at other points in time in the product's life. Yeah, but you have to consider all the different views, right? No, Your Honor. I think of it more like this. All the different views of the figures or all the different views of the product? All the different views of the product and the design. So if there were one view in which it looked similar but two others in which it was quite dissimilar, you'd have to consider all of those, right? Absolutely, Your Honor. And the way that I would consider that analysis is the following, to make an analogy to utility patents, is that if at any point there is infringement, then infringement is present. Really? That seems to be contrary to what you just said. I thought you agreed that in determining infringement you had to consider all the different views. Are you saying that if in any one view it's similar, that that creates infringement? Yes, just like de minimis infringement, for example. What case says that? Again, there are no cases with facts analogous to this one, directly analogous to this one. And so this is a novel question in dealing with a flexible product like this one in a design patent case. But the comparison I would ask the Court to consider, for example, with respect to utility patents, is if we imagine a mechanical structure that had a vertical member in one instance and folded down, for example, to have it be parallel in another instance, in one end the claim required it to be in the vertical position and it could fold down, it would only be infringing at the time that the arm was in a vertical position. And we think that it's directly analogous to here in the design patent context. Well, what picture of the fuzzy baba shows that the front top surface has a defined S-curve that bends continuously? The closest pictures, Your Honor, are going to be if you look at the reply brief on page 12 and 13 with the one in the foot. You don't see the S-curve because in a top view you don't see it. So you're saying let's ignore the S-curve. You don't see it on page 12 of your gray brief either. Page 12 of the reply brief, I think, is the one. It's in the evidence that's cited in the gray brief, which is the expert declaration, which has the full comparison of all the drawings. But I think page 12 of the reply brief is the one that I would point to with that respect. And I recognize that there are some slight differences there. Well, there's a flat plane there, or there's a flat line there on the fuzzy baba, whereas your patent design right there, it curves upward to the point where the front of the foot opening is higher up than compared to the front of the foot opening for the accused product. Yes, Your Honor. We recognize that there is a difference in the extent to which the foot opening comes up in that instance. And this is kind of a crowded art, right? Yes, Your Honor. And so, therefore, differences like this start to matter more and more, right? It is a crowded art, and that may, in fact, be the case that that could be given a little different weight. And so differences like this start to matter more and more. They may, Your Honor. But we believe, for example, that even in – and again, the way the Patent Office analyzed prior art is, again, instructive, because that also lacks the S-curve. They didn't point to that as a distinguishing feature. And whether this would be a substantial difference when the design is viewed as a whole, considering all of the views we submit is still a question for the fact finder at the end of the day. Okay. Anything more? All right. Thank you, Mr. Hollis. Okay, Mr. Davies. May it please the Court. Mr. Davies, I just had two questions, one of kind of a housekeeping nature. In the previous case, we addressed obviousness and functionality, and we sent those issues back. They are not the subject of this appeal. Are they still alive and kicking in the district court? What will happen? The obviousness issue is still pending. Okay. But, you know, we see this as a non-inflictment case, largely. So, depending on how this case turns out, they may or may not be addressed. Exactly. I mean, we don't infringe, and we can discuss that, and then the case will be over. Okay. Go ahead. Sorry. One other question. Getting back to what was being discussed with Mr. Hollis, how are we to consider, what consideration are we to give to the decision of the Board that sustained, upheld the patent, the validity of the patent, in the face of the Penta and the Laurel Hill? So, a couple of things on that. What does that do in terms of this case? I don't think it does much because we're focused on the infringement, as we were talking about this morning. Well, it sounds as though you're not defending the invalidity decision. No, I'm happy to defend it, Your Honor. It's not as clear, but I'm happy to talk about it. Well, I'm just thinking in terms of the validity decision. In terms of the validity decision, if you look at page 44, which is really, I think, the easiest way to see the relevant images for the invalidity argument, it's page 44 of our brief. The images of the design patent are in the middle, and the products that the Pant Office, the prior art of the Pant Office, we're looking at are on the side. And it's close. Oh, I understand, but what do we, no, no. But the differences that we're going to talk about, or I hope to talk about the five differences that we've been discussing this morning, they're different differences. And so they're not intellectually inconsistent to say the patent is valid or invalid. They're definitely distinct. But there is the overlap that Judge Chen was talking about. Are we to give any particular credence or consideration to the decision of the Board that came down recently on this? Well, I mean, this Court hasn't reviewed that decision. I mean, I think for its persuasiveness, it sort of stands on its merits. But I don't think its source should push you in one direction or another. Okay. Thank you. I have another question on this issue, which is this Court's prior decision in 2013, at one point questioned whether the Laurel Hill and Penta can serve as the so-called Rosen reference in a 103. So now we have in front of us those exact same references being used as 102 references. So how does that work? Is there a suggestion there that there's a little bit of a tension, maybe a lot of tension? There certainly is tension. I think you can explain it because the inquiry that this Court made clear is really more of the ordinary designer inquiry. Right. Okay. So there's more of a precise inquiry, so the differences probably register differently. But I do want to focus on infringement. I'm here for you. Yeah, I do have another question. Go ahead. For a Rosen reference, our law says it has to be basically the same as the claim design. For a 102 reference, apparently the Court says the anticipating reference has to be substantially the same as the claim design. What do you think is the daylight between those two standards? They sound very similar. Okay. You can go on with your infringement argument, though. So I think to step back, the biggest point I think that I'd like to start with is just that the overall inquiry is about deception. And that's what this Court said in Egyptian Goddess. That's what I'm really relying on, Gorham. Is somebody going to be tricked or confused thinking that they want to buy a slipper that's set out in a 103 patent, and they go into the store and they buy our product? Are they going to be tricked, deceived, because they're so similar? And there are five key differences. What about their suggestion that you can look at one angle of view and limit your infringement analysis to that? Well, let's look at it from a top view, and then we don't have to worry about the S thing. Two answers, if you want. You asked counsel for a case, and there was no case that says that. But I'm happy to look at any view. We can start with the top view, and that's on page 20 of our brief. And you look at the top view. We have a narrow opening and an egg-shaped opening. We have a slipper sock that goes on either foot. They have a slipper that has to go on the left or the right foot. You can look at side view. The district court didn't say any of these differences, right? The district court said one of the differences is indistinguishable sole that is part of the egg shape. So that rationale is definitely there for sure. She made the point that you were asking about in the sort of inherent structure in these designs. And I think just to add a little gloss to that, this is a patent on a, quote, slipper. It's not a patent on a, quote, slipper sock, and there are such patents. So I think by using the word slipper, and then if you take the Egyptian goddess sense, that you don't just take a human that doesn't know anything about this. It's a crowded art. People know what slippers are. They have this inherent, so you call it pre-programmed structure. And so that's what the district court relied on. But as Judge Dyke was saying, it doesn't really matter for this point. It's de novo review. And this court reviews judgments, not statements or opinions. And so I don't think we can dwell on that. So another difference that we've talked about in profile, the one that hasn't come up so far is on page 30, and that's the underside of it, of the items. The pattern of the gripper soles is, in ours, is uniform across. Theirs is either in T-sections or absent. Should we talk about the foot issue, which got a lot of prominence in the reply brief? So we didn't really get a chance to sort of explain as much as we might have about that. But again, we're happy to look at it with the foot. There's no, I mean, there's still many differences that are apparent, even with the foot in it. And this is on page, happy to look at the design on page 12 of the reply brief. The front shape of the slipper is still very distinct. There's actually additional differences. When you look at it with the foot, the shape of the fluff around the foot opening is different, and it's much more apparent with the foot in it. But I don't think that's the right analysis. There's no foot in the patent. The cases don't talk, the Egyptian goddess, they don't talk about the nail device at the salon. I mean, the question is, when you're buying it, are you going to be tricked? And you're buying it not with someone's foot in it, and that's why it's Appendix 1441. They themselves say, yes, those Amazon pictures, that's how they look when worn. And these are all their pictures, foot or no foot. These are the pictures that their experts put forward. Just to put a fine point on it, their opening brief has a picture of their product, the Snoozy, and they call that the inviting design, and there's no foot in that. So clearly the focus, to me, has to be on our product and on images in the patent, and neither one has a foot in it. But what if, theoretically, once the accused product is in use, then the shape and overall appearance of the accused product starts to look a lot more like the patented design? I'm just talking theoretically. Then isn't that relevant to the infringement inquiry? I mean, what you were just saying sort of suggests all that you worry about is how the accused product looks at the time of purchase. I'm not sure that's right. It's time of purchase, but a purchaser imagines the product over the course of its life cycle. And I think that was probably the mistake that was made in Contessa Foods, was the person buying the platter did care about the underside, even though he couldn't see it in the store when he got home. Oh, wow, that's not what I expected to find underneath. So sure, it's over the life cycle of the product, but the key moment is when I'm purchasing it and I think about the product. Does that answer your question? Well, what's your view about the foot? I mean, do they have to show the foot if they want to claim the slipper on the foot in the design patent? If indeed there's a difference between the shape of the design on and off the foot? I mean, you can certainly imagine cases where it would make an enormous difference whether it was on or off the body. I'm not sure I could suggest like a strict rule. I mean, you read the guidelines that the patent office has. The slipper sock patents have some have feet and some don't. I mean, I think to go to the public notice function that Your Honor was suggesting, it would certainly be a better practice, I think, to show the design that you're claiming. And if your design changes in different settings or different environments, I would think we would want people to make that clear somehow. Exactly how you express that, I think, would probably be up to the inventor. Anything more? All right. Thank you, Mr. Davis. Mr. Ross, you have two minutes. Your Honor, I'd just first like to address the point of sale question. Judge Chen asked about whether the point of sale was really the appropriate focus and counsel suggested that that was really the central time. In Contessa, this court held that an ordinary observer analysis is not limited to those features visible at the point of sale, but instead must encompass all or one of the features visible at any time during the normal use of the product. And we again believe that that's why it's appropriate, given that instruction and similar statements in International Seaway, to consider the slipper over the life of the product. We're not aware of any requirements in the case law or the patent office rules that require that the foot be shown in the slipper. And therefore, that's simply an optional feature that may be shown to show the environment, but is not required. So, again, we believe that the analysis should consider the foot. From what I understand with respect to validity, Your Honor, we don't believe there is seriously contesting validity at this point in time. And on the other issues, we'll rest on the briefs. Unless you have any further questions. Okay. Thank you, Mr. Owens. Thank both counsel. The case is submitted.